IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION | Case No. 3:25-md-3140 |
| | Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon |
| This Document Relates to: | |
| JENNIFER DAVIS, | |
| Plaintiff, | Designated Forum:<br>Northern District of Indiana,<br>Hammond Division |
| v. | |
| PFIZER INC., PHARMACIA & UPJOHN CO. LLC, and PHARMACIA LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff Jennifer Davis, by and through undersigned counsel, brings this civil action against Defendants for personal injuries and damages suffered by Plaintiff and alleges as follows:

## THRESHOLD ALLEGATIONS

1. Plaintiff is a resident and citizen of Lake Station, Lake County, Indiana.

2. Defendant Pfizer Inc. ("Pfizer") is a corporation organized under Delaware law with its principal place of business at The Spiral, 66 Hudson Boulevard

East, New York, New York 10001, and is a citizen of Delaware and of New York for the purposes of diversity under 28 U.S.C. § 1332(a).

3.      Defendant Pharmacia & Upjohn Company LLC is a Delaware limited liability company with two members, Pharmacia & Upjohn LLC and Anacor Pharmaceuticals, LLC. Pharmacia & Upjohn LLC is a Delaware limited liability company, whose sole member is Pharmacia LLC. Pharmacia LLC is a Delaware limited liability company whose sole member is Wyeth Holdings LLC, which is a Maine limited liability company. Its sole member is Anacor Pharmaceuticals, LLC, a Delaware limited liability company, whose sole member is Pfizer MAP Holding, Inc., which is organized under Delaware law and has a principal place of business in New York, New York. Defendant Pharmacia & Upjohn is therefore a citizen of Delaware and New York for the purposes of diversity under 28 U.S.C. § 1332(a).

4.      Defendant Pharmacia LLC is a Delaware limited liability company. As outlined above, its sole member is Wyeth Holdings LLC, and the sole member of Wyeth Holdings LLC is Anacor Pharmaceuticals, LLC. The sole member of Anacor Pharmaceuticals, LLC, is Pfizer MAP Holding, Inc., which is a corporation organized under Delaware law with a principal place of business in New York, New York. Defendant Pharmacia is thus a citizen of Delaware and New York for the purposes of diversity under 28 U.S.C. § 1332(a).

5.      The Designated Forum (the federal district in which the Plaintiff would have filed her case in the absence of direct filing in the MDL Court) is the Northern District of Indiana, Hammond Division.

6. Plaintiff was administered the prescription drug depot medroxyprogesterone acetate ("DMPA"). The brand name for this prescription drug is Depo-Provera®.

7. Plaintiff has been diagnosed with intracranial meningioma that resulted from or was exacerbated by Plaintiff's use of Depo-Provera.

## INTRODUCTION

8. This is an action for damages related to Defendants' wrongful conduct in connection with the development, design, testing, manufacturing, labeling, packaging, marketing, distribution, and sale of medroxyprogesterone acetate ("MPA"), also known as DMPA, and sold under the trade name Depo-Provera.

9. Defendants manufacture, market, and sell Depo-Provera as a prescription contraceptive. Depo-Provera and DMPA are manufactured as an injection to be administered to the muscular area of the upper arm or buttocks every three months.

10. Over decades, scientific studies have established that progesterone, its synthetic analogue progestin, and drugs containing progestin—in particular, DMPA and Depo-Provera—cause or substantially contribute to the development of intracranial meningioma, a kind of brain tumor.

11. Defendants knew or should have known of the link between Depo-Provera and DMPA, used as intended and according to prescription, and meningioma.

12. But Defendants failed to warn, educate, or otherwise inform users and prescribers of this risk or the need to monitor users for symptoms.

13. Until December 2025, the U.S. label for Depo-Provera made no mention of the risk of intracranial meningioma, although labels in the United Kingdom and the European Union do carry warnings regarding the risk of meningioma.

14. The Canadian label for Depo-Provera has listed meningioma among "Post-Market Adverse Drug Reactions" at least since 2015.

15. Plaintiff Jennifer Davis used Depo-Provera for contraception and was later diagnosed with an intracranial meningioma that has caused painful and debilitating symptoms and required surgery. Ms. Davis was injured as a direct and proximate result of Defendants' wrongful actions and failures to act.

16. Ms. Davis seeks judgment against Defendants and compensation for economic and noneconomic damages, statutory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

17. Based on the threshold allegations above, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity among Plaintiff and Defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

18. Venue is proper in the U.S. District Court for the Northern District of Indiana, Hammond Division, under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim, including the distribution, sale, and administration of DMPA, occurred in that Judicial District and Division.

4

19.    Defendants have significant contacts with the State of Indiana and regularly conduct business in Indiana. Specifically, Defendants engaged in the following:

a) conducted business in the state;

b) regularly solicited business in the state;

c) specifically transacted and conducted business with respect to DMPA in the state;

d) targeted physicians and health care providers in that district for the marketing, sale, and use of DMPA to be given to patients within the state;

e) engaged in substantial and continuing contact with the state;

f) derived substantial revenue from goods used and consumed within the state;

g) purposefully directed business activities, particularly with respect to DMPA, to the state;

h) purposely placed DMPA into the stream of commerce in the state;

i) expected or reasonably should have expected that DMPA would reach the state;

j) anticipated or reasonably should have anticipated that DMPA would reach the state and be prescribed to and used by individuals in the state;

k) engaged in a persistent course of conduct in the state with respect to DMPA;

l) committed a tort in whole or in part in the state;

m) reasonably expected or should have expected their acts to have consequences within the state; and/or

n) intended to serve the market of that state and therefore purposely availed themselves of jurisdiction there.

20. Plaintiff was prescribed and administered DMPA and diagnosed with a meningioma in Indiana.

21. Thus, Defendants are subject to the personal jurisdiction of the courts in that district.

## FACTUAL ALLEGATIONS

22. The link between progestin, DMPA, and Depo-Provera and intracranial meningiomas is well established by scientific research.

### *Depo-Provera*

23. DMPA was first approved by the FDA for use as a contraceptive in 1992, under the commercial name Depo-Provera.

24. The Depo-SubQ Provera 104 variant was approved in 2004, for contraception and as a treatment for endometriosis.

25. Depo-Provera is a 150 mg/mL dosage of DMPA that is injected every three months into the musculature of the buttocks or the upper arm; labelling recommends alternating the injection site.

26. Defendant Pfizer represents Depo-Provera to be one of the most effective contraceptives in existence. In fact, the Depo-Provera label groups injectable contraceptives like Depo-Provera alongside sterilization as the most effective contraceptive methods, defined as resulting in the fewest unintended pregnancies.

27. Depo-Provera is widely popular, both because of its effectiveness and because of the convenience of the quarterly injections, as opposed to the requirement to take a daily pill.

28.    According to a December 2023 National Health Statistics Report, nearly a quarter (24.5%) of all sexually experienced women ages 15–49 in the United States between 2015 and 2019 had ever used Depo-Provera.[1]

29.    According to that same report, the proportion is even greater for Hispanic (27.2%) and Black (41.2%) women.[2]

30.    According to another study, Depo-Provera is particularly popular among younger women, lower-income women, and Black women.[3]

31.    Depo-Provera was developed by Defendant Upjohn in the 1950s. The drug was first presented for approval as an injectable intramuscular formulation for the treatment of endometrial and renal cancer in 1960.

32.    Upjohn successfully received approval for Depo-Provera for contraception in international markets, including France, as early as 1969, but the U.S. market proved more difficult to access.

33.    Upjohn submitted the first New Drug Application for Depo-Provera for use as a contraceptive to the FDA in 1967; however, this application was rejected.

34.    Upjohn again applied to the FDA for approval to market Depo-Provera as a contraceptive in 1978 and 1983, but was rejected both times.

35.    Upjohn's NDA for Depo-Provera as a contraceptive was finally approved by the FDA in October 1992.

---

[1] Kimberly Daniels and Joyce C. Abma, *Contraceptive Methods Women Have Ever Used: United States, 2015–2019*, 195 Nat'l Health Statistics Reports 1, 1 (2023).
[2] *Id.*
[3] KFF, *DMPA Contraceptive Injection: Use and Coverage*, KFF.org, May 30, 2024, https://www.kff.org/womens-health-policy/dmpa-contraceptive-injection-use-and-coverage/.

36.  Upjohn merged with Swedish manufacturer Pharmacia AB to form Pharmacia & Upjohn in 1995.

37.  Defendant Pfizer acquired Pharmacia & Upjohn in 2002, thereby acquiring the Depo-Provera NDA as well as the associated responsibilities and liabilities stemming from the manufacture, sale, and marketing of Depo-Provera.

38.  Pfizer has effectively held the Depo-Provera NDA since acquiring Pharmacia & Upjohn in 2002 and has been the sole holder of the NDA since 2020.

39.  Throughout the time Defendants have marketed Depo-Provera in the United States, the drug has carried no warnings regarding meningioma, despite the well-developed scientific record establishing the link between progestin and meningioma.

### *Depo-Provera/DMPA and Meningioma*

40.  Intracranial meningioma is a medical condition in which a tumor forms in the meninges, the membranous layers surrounding the brain and spinal cord.

41.  Although the tumor formed by an intracranial meningioma is usually benign, the growing tumor can press against sensitive surrounding tissues, causing severe and debilitating symptoms ranging from seizures and vision problems to weakness, difficulty speaking, and even death.

42.  A significant number of meningiomas (15–20%) become metastatic, greatly increasing their danger.

43. Treatment of a symptomatic intracranial meningioma often requires highly invasive brain surgery in which a portion of the skull is removed to allow access to the brain and meninges.

44. Due to the sensitive location of intracranial meningiomas—very close to critical neurovascular structures and the cortical area—surgery can have severe consequences.

45. Surgery for intracranial meningioma can lead to seizures, requiring additional medication to treat them. Many patients experience postoperative anxiety and depression, leading to elevated use of sedatives and antidepressants.

46. Meningiomas related to progestin and progesterone-based contraceptives tend to manifest at the base of the skull, where removal is even more challenging, further increasing the risk of side effects, including brain injuries.

47. Radiation therapy and chemotherapy may also be required, especially when the location of the tumor in the brain makes removal risky and difficult.

48. In some cases, the location of the tumor makes surgical removal impossible or too risky. In those cases, patients must simply watch and wait, and manage the symptoms as best they can.

49. The association between progesterone or progestin and meningioma has been known or knowable for decades, particularly for sophisticated pharmaceutical corporations like Defendants, who are required by FDA regulations to engage in post-market surveillance of their products for potential safety issues.

9

50.     The medical and scientific communities have been aware of the high number of progesterone receptors on meningioma cells, especially relative to estrogen receptors, since 1983—nearly a decade before the FDA approved Depo-Provera for contraceptive use.[4]

51.     Researchers have also been aware of the relationship between progesterone-inhibiting agents and the growth rate of meningiomas at least since 1989.[5]

52.     Numerous studies published in the decades since have presented similar findings, mapping the moderating effect of progesterone-inhibitors on meningiomas.[6]

53.     Studies have also reported a positive correlation between progesterone or progestin and the incidence and growth rate of meningioma.[7]

54.     A retrospective literature review published in 2015 concluded that the available studies—including the studies cited in this Complaint—showed that

---

[4] *See* M. A. Blankenstein et al., *Presence of Progesterone Receptors and Absence of Oestrogen Receptors in Human Intracranial Meningioma Cytosols*, 19 European J. Cancer Clinical Oncology 365 (1983).

[5] *See* M. A. Blankenstein, C. van der Meulen-Dijk, and J. H. Thijssen, *Effect of Steroids and Antisteroids on Human Meningioma Cells in Primary Culture*, 34 J. Steroid Biochemistry 419 (1989).

[6] *See*, *e.g.*, S.M. Grunberg et al., *Treatment of Unresectable Meningiomas with the Antiprogesterone Agent Mifepristone*, 74 J. Neurosurgery 861 (1991); Y. Matsuda et al., *Antitumor Effects of Antiprogesterones on Human Meningioma Cells In Vitro and In Vivo*, 80 J. Neurosurgery 527 (1994).

[7] *See*, *e.g.*, M. Gil et al., *Risk of Meningioma among Users of High Doses of Cyproterone Acetate as Compared with the General Population: Evidence from a Population-Based Cohort Study*, 72 British J. Clinical Pharmacology 965 (2011); Anne Laure Bernat et al., *Growth Stabilization and Regression of Meningiomas after Discontinuation of Cyproterone Acetate: A Case Series of 12 Patients*, 157 Acta Neurochir (Wien) 1741 (2015); Michael Kalamarides and Matthieu Peyre, *Dramatic Shrinkage with Reduced Vascularization of Large Meningiomas after Cessation of Progestin Treatment*, 101 World Neurosurgery 814.e7 (2017).

mifepristone, an antiprogesterone agent, had a regressive effect on meningioma, meaning it stopped or reversed the growth of meningiomas.[8]

55.    More recently, researchers have found that prolonged use (greater than one year) of progesterone and progestin, and specifically Depo-Provera, is linked to a greater incidence of developing intracranial meningioma.[9]

56.    A 2022, literature review noted the existence of a "dose-dependent relationship" between at least one progestin and the incidence and growth rate of meningioma.[10] The study authors further noted that progesterone- or progestin-mediated meningiomas appear to be located most often in the anterior and middle base of the skull and are more likely to be multiple and require more intensive treatment.[11]

57.    A 2023 case study reported a direct link between Depo-Provera and meningioma; of ten meningioma patients who stopped using Depo-Provera, five saw "clear evidence of tumor shrinkage."[12]

---

[8] Giulia Cossu et al., *The Role of Mifepristone in Meningiomas Management: A Systematic Review of the Literature*, BioMed Research International, June 3, 2015, https://doi.org/10.1155/2015/267831.

[9] Mirella Hage et al., *Estrogen and Progesteron Therapy and Meningiomas*, 2022 Endocerinology, bqab259 (2022), https://doi.org/10.1210/endocr/bqab259.

[10] *Id.*

[11] *Id.*

[12] Hussam Abou-Al-Shaar et al., *Skull Base Meningiomas as Part of a Novel Meningioma Syndrome Associated with Chronic Depo Medroxyprogesterone Acetate Use*, 84 J. of Neurological Surgery Part B Skull Base S1 (2023).

58. In 2024, a large case control study sponsored by the French National Agency for Medicines and Health Products Safety assessed the risk of intracranial meningioma associated with the use of progestogens among women in France.[13]

59. Analyzing the histories of 18,061 women who had surgery for intracranial meningioma between 2009 and 2018, researchers found that prolonged use of Depo-Provera increased the risk of developing intracranial meningioma by 555%.

60. The increase in risk associated with Depo-Provera was the second highest of all the products considered in the study; the highest risk was associated with cyproterone acetate, which had already been withdrawn from the market.

61. The Roland study also found that a longer duration of exposure produced a greater risk.

***Defendants' Response to the Scientific Evidence***

62. Given the number and range of studies mapping the relationship between progestogens and meningioma, Defendants knew or should have known of the risk that Depo-Provera could cause or exacerbate the development of intracranial meningioma.

63. But Defendants have not adequately investigated the risk posed by Depo-Provera or made any effort to warn either the medical community or users in the United States of the risk.

---

[13] Noémie Roland et al., *Use of Progestogens and the Risk of Intracranial Meningioma: National Case-Control Study*, 384 BMJ e078078 (2024), https://doi.org/10.1136/bmj-2023-078078 (hereinafter, "the Roland study").

64.    According to the Drugs@FDA website, Depo-Provera's label has been updated fifteen times since 2003; the most recent update, in December 2025, added meningioma to the "Warnings and Precautions" section of the package insert.[14]

65.    The previous fourteen iterations of Depo-Provera labeling bore no mention of meningioma, despite the ample scientific evidence linking DMPA specifically and high-dose progestogens specifically to meningioma.

66.    Nor did Defendants take any other steps to warn or inform either the medical or the patient community.

67.    Defendant Pfizer changed Depo-Provera labeling in the EU and the United Kingdom at least a year before it made changes to the U.S. label.

68.    Furthermore, Pfizer communicated directly with healthcare providers in the United Kingdom regarding the risk of meningioma. *See* Direct Healthcare Professional Communication, Medroxyprogesterone acetate: Risk of meningioma and measures to minimise this risk, Pfizer Limited, Oct. 7, 2024, https://assets.publishing.service.gov.uk/media/672a36c1fbd69e1861921b9c/Medroxy progesterone_acetate_-_Risk_of_meningioma_and_measures_to_minimise_this_risk_-_to_publish.pdf.

69.    Additionally, Defendants' Package Leaflet in the EU, which provides information to patients, notes the risk of meningioma and advises patients to let their doctor know if they have a history of meningioma.

---

[14] U.S. Food & Drug Administration, Drugs@FDA FDA-Approved Drugs, Depo-Provera, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=020246 (last visited Jan. 21, 2026).

70. Nothing prevented Defendants from warning patients and doctors in the United States long before the Roland study.

71. Specifically, Defendants could have at any time made "moderate changes" to the label.

72. Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under 21 C.F.R. § 314.70(c) to update Depo-Provera's label without prior FDA approval.

73. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" and to "add or strengthen a contraindication, warning, precaution, or adverse reaction."

74. Clearly, adding language warning doctors and patients of the risk of meningioma associated with long-term use of Depo-Provera would fall within that provision.

75. The Third Circuit reaffirmed that plain-text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal (FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, No. 22-3412, D.I. 82 at 73 (3d Cir. Sept. 20, 2024) (noting "the availability of a label change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

76. Defendants could also have instructed physicians to consider its own safer alternative design, Depo-SubQ Provera 104, a lower-dose medroxyprogesterone acetate injected subcutaneously rather than via the more invasive and painful intramuscular route.

77. Finally, Defendants could have created a version of standard Depo-Provera to be injected subcutaneously rather than intramuscularly.

78. Injections given intramuscularly are absorbed by the body and taken up in the blood serum at much faster rates than injections given subcutaneously because of the higher vascularization of deep muscle tissue compared to the dermis.

79. Studies going back at least ten years have shown that the 150 mg dose of Depo-Provera, when administered subcutaneously, is absorbed by the body at a much slower rate than when it is administered intramuscularly.[15]

80. In fact, 150 mg Depo-Provera administered intramuscularly causes a spike in blood serum levels of DMPA more than four times higher than the peak blood serum concentration of DMPA when that same shot is given subcutaneously, and that very high intramuscular peak concentration persists for several days.[16]

81. In fact, 150 mg Depo-Provera administered subcutaneously has a remarkably similar pharmacokinetic profile to Depo-SubQ Provera 104.[17]

---

[15] James D. Shelton and Vera Halpern, *Subcutaneous DMPA: A Better Lower Dose Approach*, 89 Contraception 341 (2014), https://doi.org/10.1016/j.contraception.2013.10.010.
[16] *Id.*
[17] *Id.*

82. The slower absorption rate mitigates some of the risk associated with high-dose progestogens.[18]

83. Nevertheless, Defendants neither produced a 150 mg subcutaneous version nor offered Depo-SubQ Provera 104 as an alternative product, despite knowing that the lower dose was equally effective as a contraceptive.

***Ms. Davis Exposure and Injury***

84. Ms. Davis was first prescribed Depo-Provera for contraception on or about 1989 at Saint Josephs Family Medical Center in Plymouth, Indiana. She was administered the injection at a nearby pharmacy.

85. Ms. Davis continued to receive Depo-Provera through Saint Josephs Family Medical Center through approximately 2004.

86. On each occasion, she was injected with Depo-Provera 150 mg, manufactured by Pharmacia & Upjohn.

87. At all relevant times, through its label, packaging, and provider and patient information, Defendants represented Depo-Provera to be safe, appropriate, and suitable for contraceptive purposes.

88. In or about 2021, after experiencing headaches and other symptoms, Ms. Davis was diagnosed with a meningioma.

89. Ms. Davis's physicians advised against surgery to remove the meningioma. As a result, Ms. Davis receives frequent MRIs to surveil the meningioma.

---

[18] *Id.*

16

90. She continues to experience frequent headaches, which she takes medication to manage, as well as eye pressure and anxiety.

91. The meningioma and ongoing symptoms have caused Ms. Davis to incur significant economic damages, including medical expenses for treatment and ongoing care, as well as loss of wages and loss of earning capacity.

92. They have also caused Ms. Davis to experience pain and suffering, mental anguish, and emotional distress.

93. Ms. Davis' injuries and damages are a direct and proximate result of Defendants' wrongful actions and failures to act.

## CAUSES OF ACTION

## COUNT I
## STRICT LIABILITY—FAILURE TO WARN

94. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

95. At all material times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, or promoting Depo-Provera and placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

96. Defendants, as manufacturers, distributers, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

17

97. Defendants had and continue to have a duty to provide adequate warnings and instructions for Depo-Provera, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

98. Defendants had and continue to have a duty to provide consumers, including Ms. Davis and her physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Depo-Provera, as it became or could have become available to Defendants.

99. Defendants had and continue to have a duty to provide patients and their prescribing physicians with adequate clinically relevant information and data and warnings regarding adverse health risks associated with exposure to Depo-Provera.

100. Defendants knew or should have known, based on information that was available and generally accepted in the scientific community, that warnings and other clinical information and data they distributed regarding the risks associated with use of Depo-Provera were inadequate.

101. Defendants continued to aggressively promote and sell Depo-Provera, even after they knew or should have known of the unreasonable risks of intracranial meningioma caused by the drug.

102. Defendants marketed, promoted, distributed, and sold an unreasonably dangerous and defective prescription drug, Depo-Provera, to health care providers empowered to prescribe and dispense Depo-Provera to consumers, including Ms.

Davis, without adequate warnings and other clinically relevant information and data regarding the risk of meningioma which was available and generally accepted within the scientific community.

103. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Depo-Provera, which resulted in injury to Plaintiff.

104. The foreseeable risk of serious and potentially debilitating intracranial meningioma caused by Depo-Provera could have been reduced or avoided by Plaintiff, prescribers, and other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

105. Defendants avoided warning consumers, or suggesting that patients switch to the safer, subcutaneous formulation, to avoid raising fears about the safety of Depo-Provera.

106. Defendants knew or should have known that consumers, including Ms. Davis, would suffer foreseeable and needless injury as a result of Defendants' failures.

107. At the time Depo-Provera was supplied to Ms. Davis by Defendants, it carried inadequate warnings or instructions. Defendants neglected to issue adequate warnings that Depo-Provera causes serious and potentially debilitating meningiomas, even though that information was available to Defendants.

108. Had those warnings been provided, Ms. Davis and her physician could have considered the risks and evaluated other, safer contraception options.

109. As a direct and proximate result of Defendants' conduct, including Defendants' failure to provide warning and failure to inform physicians and patients of the risk of meningiomas, Plaintiff has suffered and will continue to suffer bodily injuries and resulting medical expenses, loss of income, pain and suffering, mental anguish, and other economic and noneconomic losses.

110. Consequently, Ms. Davis is entitled to compensatory damages for her medical expenses, loss of income, pain and suffering, mental anguish, emotional distress, and other economic and noneconomic damages.

## COUNT II
## STRICT LIABILITY—DESIGN DEFECT

111. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

112. At all material times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera and placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

113. Defendants, as manufacturers, designers, distributers, and marketers of pharmaceutical drugs, had a duty to design a product free from defective conditions that were unreasonably dangerous to users.

114. Depo-Provera was designed in such a way that it posed an unreasonable risk of intracranial meningioma, specifically by including a higher dose of

20

progestogens than was necessary for effective contraception administered intramuscularly.

115. Furthermore, Defendants were or should have been aware that a lower dose and a different administration method—subcutaneous injection rather than intramuscular—would mitigate the risks presented by Depo-Provera.

116. Defendants were also aware of a reasonable safer alternative, Depo-SubQ Provera 104, an FDA-approved product that provided effective contraception at a lower dose and delivered the medication subcutaneously, allowing for slower release of the medication into the body.

117. Defendants knew or should have known both of the dangers associated with Depo-Provera and of the significantly lower risk presented by Depo-SubQ Provera 104.

118. Despite this knowledge, Defendants neither redesigned Depo-Provera—either by reducing the dose or by switching to subcutaneous delivery—nor encouraged physicians and patients to consider the safer, lower-dose product.

119. Defendants knew or should have known that the Depo-Provera they developed, manufactured, labeled, marketed, sold, and promoted was defectively designed in that it posed a serious risk of severe and permanent intracranial meningioma-related injuries when used as directed.

120. Defendants had and have a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

121. Defendants sold, marketed and distributed a product that is unreasonably dangerous for its normal, intended, and foreseeable use.

122. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation so that it was in an unreasonably dangerous and defective condition when it left the hands of the manufacturer, such that it failed to perform as safely as an ordinary consumer would expect when used as intended.

123. Furthermore, the risks presented by Depo-Provera when used as intended outweighed its effectiveness as a contraceptive. Thus, the design of the Depo-Provera drug makes the product unreasonably dangerous.

124. Defendants knew or should have known that consumers, including Ms. Davis, would suffer foreseeable and needless injury as a result of Depo-Provera's defective design.

125. Consequently, Ms. Davis is entitled to compensatory damages for her medical expenses, loss of income, pain and suffering, mental anguish, emotional distress, and other economic and noneconomic damages.

## COUNT III
## NEGLIGENCE

126. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

127. At all material times, Defendants had a duty to use reasonable care in the design, labeling, manufacturing, testing, marketing, distribution, and sale of Depo-Provera.

128. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution, and sale of Depo-Provera in that Defendants knew or should have known that Depo-Provera created a high risk of unreasonable harm to patients, including Ms. Davis, in the form of an unacceptably elevated risk of intracranial meningiomas.

129. Defendants breached their duty of care to the Plaintiff and her physicians, in the testing, monitoring, and pharmacovigilance of Depo-Provera.

130. In disregard of its duty, Defendants committed one or more of the following negligent acts or omissions:

- Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and distributing Depo-Provera without thorough and adequate pre- and post-market testing of the product;

- Manufacturing, producing, promoting, advertising, formulating, creating, developing, designing, and distributing Depo-Provera while negligently concealing and failing to disclose clinical data that demonstrated the risk of serious harm associated with the use of Depo-Provera;

- Failing to undertake sufficient studies and conduct necessary tests to determine whether Depo-Provera was safe for its intended use;

- Failing to disclose the product defect to and warn regulatory agencies, the medical community, and consumers when Defendants

23

knew or had reason to know that Depo-Provera was unreasonably unsafe and unfit for use;

- Failing to warn Ms. Davis and other patients, the medical and healthcare community, and consumers of the known and knowable risk of harm associated with the product and that safer and effective alternative products were available to Ms. Davis and other consumers;

- Failing to provide adequate instructions, guidelines, and safety precautions to those persons it was reasonably foreseeable would use Depo-Provera;

- Advertising, marketing, and recommending the use of Depo-Provera while concealing and failing to disclose or warn of the known and knowable dangers connected with, and inherent in, the use of Depo-Provera;

- Representing that Depo-Provera was safe for its intended use when Defendants knew or should have known that the product was not reasonably safe when used as intended and for its intended purpose;

- Continuing to manufacture and sell Depo-Provera with the knowledge that Depo-Provera was unreasonably unsafe and dangerous;

- Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Depo-Provera so as to

24

avoid the risk of serious harm associated with the use of Depo-Provera;

- Failing to design and manufacture Depo-Provera so as to ensure the drug was at least as safe and effective as other similar products;

- Failing to ensure the product was accompanied by proper and accurate warnings regarding the risk of intracranial meningioma associated with the use of Depo-Provera;

- Failing to ensure the product was accompanied by proper and accurate warnings about known and knowable adverse side effects associated with the use of Depo-Provera and that use of Depo-Provera created a high risk of severe injuries;

- Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Depo-Provera; and

- Failing to sell a product providing the lowest effective dose of a dangerous drug knowing that the contraceptive purpose could be more safely accomplished with lower effective dose formulations that were available on the market.

131. A reasonably prudent manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in these acts and omissions.

132. As a direct and proximate result of the Defendants' negligent conduct, Ms. Davis has been seriously injured and sustained severe and permanent pain, suffering, loss of income, and economic damages.

133. Consequently, Ms. Davis is entitled to compensatory damages for her medical expenses, loss of income, pain and suffering, mental anguish, emotional distress, and other economic and non-economic damages.

**Count IV**
**Gross Negligence**

134. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

135. In refusing to acknowledge or act on information about the inherently dangerous nature of Depo-Provera, Defendants acted willfully and recklessly, with disregard for the rights and safety of Ms. Davis and others.

136. Defendants had actual notice of the inherent dangerousness of Depo-Provera, in the form of ample and well-established scientific research mapping the connection between progestogens, and specifically Depo-Provera, and intracranial meningiomas.

137. By denying, minimizing, or suppressing such information, Defendants not only exposed Ms. Davis and others to a high risk of serious injury; they also denied Ms. Davis and others information they needed to protect themselves.

138. The actions of Defendants and their employees, agents, officers, and representatives were willful and wanton and exhibited a reckless disregard for the life, health, and safety of the end users of Depo-Provera, including Ms. Davis.

26

139. Defendants' reckless, willful, and wanton conduct was the direct and proximate cause of Ms. Davis's serious bodily injuries.

140. But for Defendants' grossly negligent acts or omissions, Ms. Davis would not have been injured.

141. Consequently, Ms. Davis is entitled to compensatory damages for medical expenses, loss of income, pain and suffering, mental anguish, emotional distress, and other economic and non-economic damages.

142. Ms. Davis is also entitled to punitive damages for Defendants' utter disregard for her rights or safety.

## COUNT V
## BREACH OF EXPRESS AND IMPLIED WARRANTIES

143. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

144. At all times relevant to this action, Defendants manufactured, marketed, labeled, and sold Depo-Provera, as previously alleged and described in this Complaint.

145. Defendants knew of the use for which their product was intended and impliedly or expressly warranted that the product was merchantable, safe, and fit for its intended purpose.

146. Defendants breached their implied or express warranties because their product did not meet reasonable expectations for performance when used as intended and was neither of merchantable quality nor safe for the intended use in that the product has a propensity to cause serious injury, including intracranial meningiomas.

27

147. Defendants' breach of their implied or express warranties proximately resulted in the injuries and damages suffered by Ms. Davis.

148. Ms. Davis is within the class of foreseeable users and reasonably relied upon Defendants' judgment and Defendants' implied or express warranties in using Depo-Provera.

149. Consequently, Ms. Davis is entitled to compensatory damages for medical expenses, loss of income, pain and suffering, mental anguish, emotional distress, and other economic and non-economic damages.

## COUNT VI
## FRAUDULENT MISREPRESENTATION

150. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

151. Defendants have falsely and fraudulently represented and continue to represent to the medical and healthcare community, Ms. Davis and her physicians, other patients and physicians, and the public in general that Depo-Provera has been appropriately tested and found to be safe and effective for its intended uses.

152. At all material times, Defendants misrepresented to consumers and physicians, including Ms. Davis and her physicians and the public in general, that Depo-Provera is safe for use as a contraceptive.

153. These representations were, in fact, false.

154. When Defendants made these representations, they knew or had reason to know that those representations were false.

155. Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of Depo-Provera.

156. Prior to and during Ms. Davis's use of Depo-Provera, Defendants knew or should have known of adverse event reports and scientific literature indicating the highly elevated risk of intracranial meningioma in individuals who had taken Depo-Provera.

157. Defendants did not warn or inform physicians, patients, or the public about this risk, or inform physicians, patients, or the public about the existence of a reasonable, equally effective, safer alternative.

158. Specifically, despite updating Depo-Provera's labeling at least thirteen times over twenty years, Defendants did not add a warning or information about the connection between Depo-Provera and intracranial meningioma until December 2025.

159. These representations were made by the Defendants with the intent of defrauding and deceiving the medical community, Ms. Davis, and the public, and inducing the medical community, Ms. Davis, her physicians, and the public to recommend, prescribe, dispense, and purchase Depo-Provera for use as a contraceptive.

160. In representations to Ms. Davis and to her healthcare providers, including Ms. Davis's prescribing physicians at Saint Josephs Family Medical Center,

Defendants fraudulently stated that Depo-Provera was safe and omitted warnings related to intracranial meningioma.

161. Defendants had a duty when disseminating information to the public to disseminate truthful information, and a parallel duty not to deceive the public, physicians, or patients.

162. Defendants' concealment and omissions of material facts concerning the safety of Depo-Provera were made purposefully, willfully, wantonly, or recklessly.

163. In reasonable reliance upon these false representations, Ms. Davis was induced to use Depo-Provera, which caused her severe, debilitating, and permanent personal injuries and damages.

164. As a direct and proximate result of her reliance upon Defendants' fraudulent misrepresentations, Ms. Davis has suffered and will continue to suffer serious bodily injuries and resulting pain and suffering, disability, mental anguish, and other losses.

165. Consequently, Ms. Davis is entitled to compensatory damages for medical expenses, loss of income, pain and suffering, mental anguish, emotional distress, and other economic and noneconomic damages.

166. Ms. Davis is also entitled to punitive damages for Defendants' conscious disregard of her safety and rights in willfully, maliciously, and intentionally misrepresenting that Depo-Provera was safe, demonstrating wanton disregard for the safety of others, including Ms. Davis.

## Count VII
## Punitive Damages

167. Plaintiff reaffirms and realleges the foregoing paragraphs and incorporates them herein.

168. Defendants engaged in willful, wanton, malicious, and reckless conduct without regard to the consequences or safety of Ms. Davis and others.

169. Defendants' willful, wanton, malicious, and reckless conduct caused Ms. Davis to sustain serious injury, disregarding her protected rights.

170. Defendants' willful, wanton, malicious, and reckless conduct includes but is not limited to Defendants' failure to warn Ms. Davis, her physicians, and others of Depo-Provera's link to intracranial meningioma; failure to take action to correct the defective design of the product; fraudulent concealment of Depo-Provera's dangers defect; and failure to disclose the inherently dangerous nature of Depo-Provera when Defendants learned or should have learned of it.

171. Defendants have caused significant harm to Ms. Davis and have demonstrated a conscious and outrageous disregard for her safety with implied malice, warranting the imposition of punitive damages.

172. Consequently, Ms. Davis is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

1. That this Court find Defendants liable, jointly and severally, on each of the claims and Causes of Action named in this Complaint.

2.      That this Court award Plaintiff Jennifer Davis compensatory damages for past and future medical expenses, loss of income, pain and suffering, emotional distress and medical monitoring, and other economic and noneconomic damages, together with interest and costs as provided by law.

3.      That this Court award Plaintiff punitive damages for the wanton, willful, fraudulent, or reckless acts of the Defendants.

4.      That this Court award Plaintiff costs and attorneys' fees as allowed by law.

**5.**      That this Court award such further relief as is necessary in the interest of justice.

## JURY DEMAND

Plaintiffs demand a trial by jury on all matters so triable.

This, the 19th day of June 2026.

MILLER LAW GROUP, PLLC

By:  /s/ W. Stacy Miller II
W. Stacy Miller II
N.C. Bar No. 21198
MaryAnne M. Hamilton
N.C. Bar No. 59323
Post Office Box 6340
Raleigh, NC 27628
T: (919) 348-4361
F: (919) 729-2953
maryanne@millerlawgroupnc.com